Good morning. We have three argued cases this morning. The first of these is No. 14-1573, Flores v. HHS. Ms. Schwartz. Good morning. May it please the Court, my name is Susan Schwartz and I am the representative of the petitioner Valeria Flores. It is petitioner's intention in this case, Your Honor, that she provided to the Court a preponderant theory connecting her receipt of the second dose of the HPV vaccination with the spinal cord stroke, which was sustained. Her expert, Dr. Kerr, was uniquely qualified to offer the opinions that he brought to the courtroom and testified on the basis of the best scientific understanding available that the HPV vaccine, more probably true than not, based upon a reasonable degree of medical certainty and reasonable medical probability, caused the thrombosis, which resulted in Valeria's paralysis. So, I mean, it seems to me you had a very good case before the special master. The problem is our job is not to find the facts or to find the legal issue that we should decide that would allow you to prevail. Well, the legal issue in this case is that the special master denied recovery for the petitioner because, in essence, he found our expert, Dr. Kerr, utterly unpersuasive. The opinion, if it's read carefully, is wrought with language that begins with the special master's assumption, which is a basic assumption about why vaccine injuries in cases of genetic susceptibility was flawed. And from there, he proceeded to maintain that Dr. Kerr was engaging in sheer guesswork, flawed suppositions, no basis, no reliability, even though he was the only person who testified in the case who had any real, actual knowledge in the case. It is our suggestion, Your Honor, that basically, even though the opinion is phrased in the rhetoric of a credibility determination, what really was at issue in the case was that the special master was looking for Dr. Kerr to provide a specific article or a specific piece of evidence that categorically stated that HPV vaccine causes either a stroke or a blood clot that could be presented to him as a basis on which to find him. This holding that there has to be something specifically in the medical literature to demonstrate general acceptance within the medical community is specifically what has been stated not to be required and not necessary under the Vaccine Act. Where did he say that that was necessary? Well, Your Honor, throughout, again, as he's saying that this was a totally one-sided case, there's never any credence given to anything that's said by Dr. Kerr. He then looks to and he says that witnesses were asked, show me where the literature states that HPV vaccine can cause inflammation in situ. He states that Dr. Kerr provided literature that demonstrated to him that the influenza vaccine can cause inflammation in situ, arteritis. And again, this is one of the mechanisms whereby Dr. Kerr was proposing to analogize the way in which the HPV vaccine could cause a stroke by that process. He said it shows that the special master, this shows that the influenza vaccine may cause arteritis or may cause giant cell arteritis, but it doesn't show that the HPV vaccine causes it. And that is where the crux of the problem lies. There isn't any literature that exists as there often is not in a vaccine case that a specific injury occurred because of the specific vaccine. But that's why we allow in the vaccine court the petitioner to present a case supported by reputable medical opinion. Again, it seems to me that, and your argument here seems to be directed mostly to the prong one of the Alpha test. And it seems to me that you have some really good arguments there that the special master kind of didn't take the theory that this vaccine could cause a stroke seriously enough. But what I'm struggling with is even under the theories your expert presented, the special master looked at the actual medical records and said there's no evidence supporting inflammation or there's no evidence supporting the platelet aggregation theory. And I know you disagree with that, but once you see those medical records, I wonder how we can find the conclusion on Altenprog 2 to be arbitrary and capricious. And while you're at that, you said there's no real evidence or no real knowledge by the opposing experts. I'm lucky. I went back and looked. Dr. Gill is the only hematologist and Dr. Bingham is a board certified pediatric neurologist. They have some real knowledge. Absolutely, Your Honor. And I will start there for the moment. And again, I think what's significant though that what we're dealing here with is a clot, which everyone agrees she had, that caused a spinal cord stroke. And we're trying to figure out what caused that blood clot. Dr. Bingham, a child neurologist, has only treated one, in all of his decades of practice, one case of spinal cord stroke. He admits, I'm not an expert in spinal cord strokes. That's not my area of expertise. That's not what I do, which I think tells us two things. One, spinal strokes are pretty rare and they don't happen in 14-year-old girls. But this sounds like you're asking us to re-weigh the evidence. I mean, this is the problem. Unless you have a legal argument for why the doctor's testimony is completely inadmissible, then even if you were to re-examine, and if we accept that those two doctors' testimony about the actual physical conditions can be evident, then again, I don't understand how we could find the special master's reliance on that testimony arbitrary and capricious. Well, if arbitrary and capricious or discretionary value is to have any cause to be examined, I think this is the case. Assuming a weighing took place, I'm assuming, Your Honor, and I ask you to assume and to look carefully at the language that there was no weighing. The language is that the master found Dr. John and Dr. Bingham substantially more persuasive than that of Dr. Kerr in this case. So there was weighing that took place. You can't say there wasn't. Well, again, I think we have to look at what was weighed and what was being persuaded upon, and if I can for a moment, neither one of them had an opinion as to what caused the thrombosis. They didn't have an opinion what caused the thrombosis. They had an opinion what didn't. They only had an opinion what didn't. Now, they looked at it, and the reason that they did not agree with the interpretation, the mechanisms that were proposed by Dr. Kerr, first, that there was inflammation in situ is because the lab tests were negative. And again, Dr. Kerr specifically in his report stated from the very beginning when the case was filed with the petition that those lab tests were negative and that he would not expect them to be positive because this was not the type of systemic infection, systemic inflammation that he was talking about. And that's what happened in this case. Sometimes we have medical experts that are using terms that sound similar, but they're not the same and they're not interchangeable. And that's why he was very careful to lay out what he meant by the systemic infection was not an infection that goes throughout the body like a septic infection where a blood test would be able to find that there were decreased blood cells or increased white blood cells, but it was systemic in that it affected different parts of the body, beginning with the headache, which was the meningeal circulation, which again, none of the defendant's experts disputed that Valeria had a headache. None of them said that that headache was caused by anything else other than what Dr. Kerr said it was by the vaccine. He then talked about the neurological evidence of not just the local reaction in the arm, but that there's spread to loss of sensation and paralysis, which again was another neurological systemic, two different areas of the body type of infection that was part of this exuberant inflammatory response. So in that sense, I don't think the special master understood or looked at that part of the testimony to say that the tests were negative. Dr. Kerr never said that they would have been positive and in fact from the very beginning said that they would not. And Dr. Bingham, as the neurologist, also concurred and conceded as part of his testimony that you can have an in-situ inflammation, a vasculitis, which is the clumping together of the cells, which is the infection in-situ on the wall of the artery that Dr. Kerr said could have occurred in this case, and that there would be no systemic signs of infection. This same concession... So the error here is giving weight to the absence of systemic signs of infection when there is no systemic signs of infection. The claimant's own expert said you wouldn't expect to see systemic signs. Is that what you're saying? Well, again, we're using systemic in two different ways. I'm trying to do my best. The error I'm suggesting, Your Honor, was that once the special master determined that Dr. Kerr was off-base, not to be mistaken, that that decision colored, flavored, influenced his discussion, his looking at every other issue. Well, that happens. That's the nature of fact-finding. But try to answer my question. Is your argument that the special master gave too much weight to the absence of evidence of systemic inflammation when that really wasn't relevant? Is that your argument? No. The argument, Your Honor, is he gave too much weight to the fact that there wasn't literature out there that said that there was HPV vaccine associated with either stroke or thrombosis specifically, instead of the literature that was being used to... Again, that goes to problem one. I think that the problem is that even accepting the theories proposed by Dr. Kerr, that the special master went on and found that the physical elements of HPV were not relevant, that the evidence didn't support those theories. And that's what we're talking about the inflammation for. And he found that the evidence didn't show any evidence of systemic inflammation. And I think you're trying to make an argument that he misunderstood what was testified, but didn't Dr. Bingham also testify that there was no evidence of localized inflammation in the spinal cord? Well, again, he's looking at the cerebral spinal fluid, which, again, is the test that is the classic test for an infectious autoimmune process, the transverse myelitis, which is not what this patient had. Even Dr. Gill and Dr. Bingham, they both agree she doesn't have transverse myelitis. Nobody offered that opinion. So it would not be expected that that CSF would be positive. So again, going back to what the transverse myelopathy was, from the only physician in the case who works at an institution that was developed specifically to explore what the pathological entities are that cause transverse myelopathy and spinal cord strokes. So that state-of-the-art treatment can be afforded to these patients and they can be taken care of. The only person that had any expertise on the issue of what causation was, wasn't believed on any basis whatsoever. Okay. Ms. Schwartz, you're into your rebuttal time. Do you want to say the remainder? I will say the remainder, Your Honor. Thank you very much. Ms. Ricciardella, is that how you spell it? That's correct, Your Honor. Good morning. May it please the Court. I'm Lynn Ricciardella, representing respondent in this case. So maybe you don't know the answer to this question, but I'm curious. In these off-table cases, how many times are the claimants successful before the special master? As a proportion of the total number of off-table cases. Your Honor, I truly don't know the answer to that. I will say this Court, though, only sees those cases that are not conceded by the government, that are not settled by the government, even off-table cases. But in terms of an actual percentage, I don't even want to guess because I truly am not privy to that information. But, Your Honor, this appeal is simply Petitioner's disagreement with the special master's evaluation of the evidence, and with his conclusion that the preponderance of the evidence weighed against vaccine causation. As Judge Sweeney noted, Petitioner dismisses the deferential, arbitrary, and capricious standard of review, and she instead asks this Court to re-weigh the evidence, as Your Honor noted during the counsel's argument. And she asks that you re-weigh the probative value of that evidence in the hope that you'll reach a different conclusion. The special master did exactly what Section 13A of the Vaccine Act required him to do, and he looked at the record as a whole. And he ultimately concluded that respondents' experts were much more persuasive than Petitioner's experts, that the case was quite one-sided, and it was not a close case. And as Judge Sweeney commented, the special master's decision reveals a thorough review of all of the... That's a bit questionable that it wasn't a close case, right? Not in our opinion, Your Honor, that it wasn't questionable. We think that we agree with the special master that there are two experts, Dr. Gale, who was the only hematologist to testify in a case that ultimately turned on what caused the blood clot. And then as Judge Mollag, I believe you pointed out, Dr. Bingham is himself a pediatric neurologist. That when one looks critically at the evidence, as the special master did, it supports his decision that it simply, when he weighed the evidence to scale tip, decidedly in favor of the respondents. There does seem to be at least a couple of significant errors in the way the special master treated the theory of causation here. Even Judge Sweeney found that there were a couple of errors. And to me, that seems like the special master unfairly discounted the theory. And if that's the case, if we think he was wrong on prong one, isn't it possible that his errors there affected his analysis on prongs two and three? No, Your Honor. The way the special master approached his decision, the off analysis was at the end. He really combined, for the first 23 pages of his decision, prongs one and two together. He analyzed Kenneth and did it. I'm not sure that helped your argument. If we think he erred in prong one in his analysis, combined the both, then that seems to suggest that maybe he erred in both. But you have to prove under Olson, you have to prove all three prongs independently. And even if this Court finds that he erred in prong one, as Judge Sweeney found, her analysis really centered on prong two of Olson. Well, I think the suggestion is that maybe the errors on prong one affected his analysis on prong two. But I don't really see how the errors on prong one affected his analysis, because his analysis on prong two looked at this petitioner's medical records and he said, Dr. Kare's theory here is that she either had a clot caused by inflammation or by platelet aggregation. But there is absolutely no evidence in her record, this petitioner's record, that she had inflammation or platelet aggregation. And Drs. Gill and Bingham testified specifically to that. They said that this concept of a localized inflammation doesn't really make sense when you look at it scientifically. Even look at Dr. Kare's opinion. He's saying it's a localized inflammation that's not detectable by testing. But it's contradictory to other parts of his theory when he does describe it as a systemic inflammation. And the Special Master points out in his decision all the time that Dr. Kare used the phrase systemic inflammation. And also think about what he's saying. He's saying that her headache was caused by inflammation, her arm pain was caused by inflammation, her brachycardia, hypotension, asystole, the heart and lungs were caused by inflammation, different systems of the body. So it's not just simply localized in the spinal cord. So even Dr. Kare's own theory is inconsistent, and that's what the Special Master is noting. So he's noting, he's taking it as part and parcel of prong one and two, but I would represent that no, even if this court were to find that he was somehow wrong on prong one, that the petitioner, and specifically Dr. Kare, did not show a logical sequence of cause and effect linking delirious spinal cord stroke to the theory of inflammation and platelet aggregation. And if I could just get back briefly to the genetic predisposition, we respectfully disagree with Judge Sweeney. We don't believe that the Special Master was demanding that Dr. Kare give specific evidence of a particular gene that malaria had. I think it's very important to keep in mind the totality of the evidence. What was he looking at? In the first two expert reports that Dr. Kare submitted, he was unequivocal that the petitioner's MTHFR mutation predisposed her to thrombosis. In fact, he said in his second report, the MTHFR is a key enzyme in homocysteine metabolism, and the elevated homocysteine is strongly associated with thrombosis and enhanced systemic inflammation. And again in the second report, he said, these events, her rapid succession of symptoms, these events occurred rapidly after vaccination because Ms. Flores had a predisposition of increased inflammation and platelet aggregation due to her MTHFR mutation. Therefore, the threshold for thrombosis was reached earlier and was more fulminant than it would have occurred in somebody without the mutation. After he submitted that, we submitted the expert report of Dr. Gill, and we submitted the Zetterberg article. The Zetterberg article actually looked at the specific MTHFR1298 mutation, and they said it does not increase homocysteine production. And they also cited another investigator who found the same thing. The Zetterberg article also said that the MTHFR1298 mutation, it's not a critical factor in this case. It's an equivocal polymorphism. It's a fairly weak thrombophilic risk factor. He changed his opinion at hearing. That's the universe of the evidence that the special master is looking at. Again, the Vaccine Act asked him to look at the record as a whole. He is doing that. He's not, for the first time at hearing now, Dr. Kerr is saying, oh, okay, it's not the MTHFR alone. It has to be this genetic loading. You need six, seven, eight, or nine genes. Although I can't point to anything in the record that she even has these genes. We don't know what they are. But you have Dr. Gill coming in and saying, she was tested for all the known genes that cause thrombosis. Negative. We have the MTHFR benign. So that's what the special master, this court immobily said, the special master is expected, indeed required, to look into the reliability of an expert's testimony. And that's what he did with Dr. Kerr. He said, you're throwing out that she has a genetic predisposition, but the evidence that you're using for that is your ultimate conclusion in this case, that she has a vaccine entry. It's a circular argument. You can't use your opinion that she has a vaccine entry as evidence that she has a genetic susceptibility. You have to give me something else, and that something else was lacking. That's all the special master was saying. One other point I'd like to... Well, he was saying more than that. He was saying there is contrary negative evidence that that genetic mutation does not cause inflammation. Absolutely, Your Honor. Absolutely. And one other point that was raised by petitioners, he had no way in this decision was requiring them to submit a piece of literature that specifically said the HPV vaccine can cause spinal cord stroke. He, in his decision, actually said, I cannot be required to... Andrei says, I cannot be required to have you submit that. However, when you do give me literature, I am duty-bound to look at it, and the literature that you gave to me is simply not that persuasive. Now, if all we had was Dr. Kerr's testimony and the literature that arguably is, yes, circumstantial, it's not about the HPV vaccine, it's not about spinal cord stroke, but the special master didn't reject it out of hand. He just said, when looking at the totality of the evidence, we have here, we've got the respondents' evidence, we've got Dr. Gill, the only hematologist to testify, we have Dr. Bingham, and we have the Novi article, we've got the Slade article, we've got all these other articles that now the balance is tilting now in favor of respondents' evidence. That's all he's saying. He's not requiring them to show a specific mechanism of injury. That's just simply an inaccurate representation of the decision. So what are we to make out of the fact that the government's experts were unable to identify a theory of alternative causation? Well, Your Honor, the burden never shifted to the government in this case to show an alternative. But it's still relevant, isn't it, that there's no alternative theory? Well, I think it's relevant to the fact that this, and Dr. Bingham testified, that in spinal cord strokes, actually, in the majority of cases, no one knows what causes them. And the special master addressed that in his decision, saying that the fact that we don't know what caused valerious stroke cannot be evidence weighing in favor of vaccine causation. Specifically given the fact that the majority of spinal cord strokes, nobody knows the cause. And so in this case, the government, our experts admittedly don't know the cause, but the burden never shifted to the government to show an alternate cause because petitioners never made a prima facie case of vaccine causation. So unless the Court has any other questions, I thank you. Thank you, Ms. Ricciardella. Ms. Schwartz, you've got about two minutes here. Dr. Kerr used a clinical scenario. Do you know what the statistics are about the success of off-table claimants before the special master? Mine would be totally anecdotal, Your Honor. It's the only vaccine case I've ever had. So for me to be the person to provide you with that information would be incorrect. In terms of, again, the evidence in this case and the causation, I do need to talk about NOVI for just a minute because it was important to the special master. But what's important in NOVI is, unlike what they're trying to say that the cause of a spinal cord stroke is not known, the cause of a spinal cord stroke in this case is known. It was a blood clot. And in NOVI, only two of the 37 patients that the Swiss neurologists and radiologists examined that had been admitted to the hospital where the average age, again, was 19 through the age of 80 with the median age of 56, adding more evidence to the 14-year-olds don't have this kind of stroke. Only two persons in that study had a transverse myelopathy. And the cause in that case was known. They had prolonged periods of arterial hypotension. So the NOVI article provides nothing in this case, once again, because it tells us what the cause of the stroke was in the two patients that had a stroke that's like Valeria's. Again, in this case, it is our contention that she may be the first. She may be the only. There is no study literature out there that says HPV vaccination causes a spinal cord stroke like Valeria has. The only way you get there and the only way you can get there and what was allowed and what was envisioned by the Vaccine Act was providing a reliable medical opinion. We chose the best expert we could. We didn't choose an expert who's never diagnosed a spinal cord stroke. We didn't choose an expert who's never treated a spinal cord stroke. That's who Dr. Bingham were and Dr. Gilbert. We chose a person whose role in life as a neuroscientist has been the evaluation and the evaluation of what causes these strokes and how can I treat them. And that is the expert who provided the basis that what was our theory in this case. But that's what was rejected by the special master. Again, we say under the rubric, he wants to say a credibility determination, but the special master was looking for Dr. Kerr to provide. He's now at Biogenic, Your Honor, at the time of the occurrence. He was at Johns Hopkins. There has been some litigation. You can look it up, whatever, about an academic issue. But the special master specifically stated that that did not influence his opinions in this case. That's what I recall, yes. I thought I saw something. Okay, Ms. Schwartz, I think we're out of time. Thank you.